In the Matter of SYRACUSE UNIVERSITY, Appellant, v CITY OF SYRACUSE et al., Respondents.

Fourth Department, February 28, 1983

APPEARANCES OF COUNSEL

*Bond, Schoeneck & King* (*John Beach, H. Dean Heberlig* and *Joseph Zagraniczny* of counsel), for appellant.

*David M. Garber, Corporation Counsel* (*Fisher & Fisher, Andrew S. Fisher, Harold L. Fisher, Gerald Gorinsky, Howard Birnbach* and *James T. Spaulding* of counsel), for respondents.

*Nixon, Hargrave, Devans & Doyle* (*G. Robert Witmer, Jr.,* and *Mary Ann Devane* of counsel), for University of Rochester, *amicus curiae.*

*Louis N. Kash, Corporation Counsel* (*Susan L. Hauser* of counsel), for City of Rochester, *amicus curiae.*

*Shane & Franz* (*J. Michael Shane* of counsel), for St. Bonaventure University, *amicus curiae.*

OPINION OF THE COURT

DENMAN, J.

Petitioner, Syracuse University, brought this proceeding pursuant to article 7 of the Real Property Tax Law to review a determination of the Commissioner of Assessment for the City of Syracuse that a parcel of real property owned by the university should be assessed at one half its total value. A newly constructed stadium facility known as the Carrier Dome is situated on that parcel. The commissioner's determination was confirmed after hearing by the board of assessment review and the university instituted this proceeding. The university moved for summary judgment, claiming entitlement to a full exemption as a matter of law because the facility is used primarily for educational purposes and the city cross-moved to compel compliance with its notice of discovery for financial records pertaining to activities at the Carrier Dome. Special Term denied petitioner's motion for summary judgment, concluding that the use which has been made of the Carrier Dome and the extent to which the facility has produced income from noneducational activities are relevant factors to be explored through further discovery. We agree.

Construction of the Carrier Dome was completed on September 19, 1980, at a cost of approximately $27,500,000 including $15,000,000 appropriated by the New York State Legislature. The period under review is from that date to July 1, 1981, the taxable status date for the 1982 tax roll. Detailed logs of activities for which the facility has been used indicate that it was used for a variety of intercollegiate athletic programs and events, including football, basketball, lacrosse, soccer and track, as well as other university activities such as concerts, commencement exercises and band practices. In addition, it is available to the university's students, faculty and employees every weekday from 11:00 A.M. to 3:00 P.M. for recreation and sports. The university has permitted other not-for-profit corporations to use the Carrier Dome for various activities such as football championship games, the New York State Field Band Conferences, and Greater Syracuse Chamber of Commerce events. The university alleges that the facility was in active use 185 days during the period under review, of

which the university used the dome for educational purposes on 178 days. It claims that of the 771,701 people who attended events during the period, 91.6% were in attendance at the university's educational functions.

The City of Syracuse contends, however, that in addition to the afore-mentioned activities, the Carrier Dome has been used extensively for noneducational purposes. It claims that concerts, a professional boxing match, political fund raisers, nationally televised sports festivals, and other commercial events have been held there. Gross revenue generated by such events are alleged to amount to $8,139,000 of which only $2,448,000 has been allocated to expenses. As a consequence, the city contends that there are factual issues to be determined as to the extent to which the premises should be considered tax exempt as devoted exclusively to educational purposes.

The university argues that under section 420 (subd 1, par [a]) of the Real Property Tax Law[1] the Carrier Dome is entitled to a full exemption from taxation as a matter of law. That section affords a tax exemption to a corporation or association organized exclusively for educational purposes when the real property for which the exemption is sought is "used exclusively for carrying out thereupon one or more [exempt] purposes." Inasmuch as there is no real dispute that the university is organized and conducted exclusively for educational purposes, the issue that must be determined is whether Carrier Dome is "used exclusively" for such purposes. Exclusive use has been interpreted to mean principal or primary use "purposes and uses merely auxiliary or incidental to the main and exempt purpose and use will not defeat the exemption" (*Matter of Association of Bar of City of N. Y. v Lewisohn,* 34 NY2d 143, 153; see, also, *Mohonk Trust v Board of Assessors of Town of Gardiner,* 47 NY2d 476, 483). "[A] merely incidental use of the property for other than exempt purposes will not destroy the exemption * * * However, to the extent that non-exempt uses do occur on the premises and where they cannot be said to be merely 'incidental' purposes an alloca-

---

1. Section 421 of the Real Property Tax Law was renumbered section 420 by chapter 105 of the Laws of 1981, effective May 15, 1981. Chapter 919 of the Laws of 1981 renumbered section 420 as section 420-a, effective January 2, 1982. Since the taxable status date herein was July 1, 1981, the section number in effect on that date is used.

tion or partial exemption is mandated" (*Matter of Genesee Hosp. v Wagner,* 47 AD2d 37, 44, affd on opn below 39 NY2d 863).

If the activities described in the logs submitted by the university such as athletic practice, intercollegiate games, commencement ceremonies, etc., were the only type of use with which we were concerned, there would be little problem in finding that those uses are "reasonably incidental" to the university's educational purposes (see, e.g., *University Auxiliary Servs. at Albany v Smith,* 78 AD2d 959, affd on opn below 54 NY2d 986; *Matter of Faculty-Student Assn. of State Univ. Coll. at Oswego v Sharkey,* 35 AD2d 161, affd 29 NY2d 621). However, the argument advanced by the City of Syracuse is well taken, viz., that although the university has submitted a series of logs which appear to give detailed accounts of the use of the dome, it has failed to comply with the city's discovery notice with respect to financial records of revenue-producing events. Such records, it argues, will reveal that the dome has been used for a number of commercial activities. The city alleges, for example, that since the tax date in question, there have been two rock concerts by the Rolling Stones which drew 90,000 people and that ticket sales amounted to well over $1,000,000. Before the facility can qualify for a tax exemption, it must be determined that the primary purpose for which it is used is educational or reasonably incidental thereto and that it is not being used as a guise for profit-making operations (*University Auxiliary Servs. at Albany v Smith,* 78 AD2d 959, 960, affd on opn below 54 NY2d 986, *supra*).[2]

In this regard we note that the Carrier Dome is a unique facility in important respects. Some of the uses for which it

---

2. Section 420 (subd 1, par [d]): "(d) Real property such as specified in paragrap[h] (a) ... of this subdivision shall not be exempt if any officer, member or employee of the owning corporation or association shall receive or may be lawfully entitled to receive any pecuniary profit from the operations thereof, except reasonable compensation for services in effecting one or more of such purposes, or as proper beneficiaries of its strictly charitable purposes; or if the organization thereof for any such avowed purposes be a guise or pretense for directly or indirectly making any other pecuniary profit for such corporation or association or for any of its member or employees; or if it be not in good faith organized or conducted exclusively for one or more of such purposes."

has been adapted are apparently commercial ventures which are open to the public, e.g., rock concerts and professional sports events. The university argues that occasional, or that which it styles *"de minimis"*, uses for other than exempt purposes will not destroy the tax exemption, relying on *People ex rel. Watchtower Bible & Tract Soc. v Haring* (8 NY2d 350). Whereas the rule enunciated in *Watchtower* does so provide, we point out that the test is not a quantitative one. Rather, the measure of the property's tax status is whether the nature of its primary activities is consistent with an exempt purpose. Additionally, in the event the property "is not so used exclusively" for exempt purposes, revenue produced from leasing or from nonexempt activities may not exceed the limitation of subdivision 2 of section 420 of the Real Property Tax Law which limits the proceeds to an amount equal to the carrying, maintenance and depreciation charges on the property (see *Sisters of St. Joseph v City of New York*, 49 NY2d 429). Review of the case law and legislative history dealing with this statutory exemption makes abundantly clear that the section attempts to reconcile two meritorious, but competing, interests: that of encouraging and protecting religious, educational and charitable institutions (see *People ex rel. Watchtower Bible & Tract Soc. v Haring,* 8 NY2d 350, 357, *supra*) with the problem of limiting the proliferation of tax exemptions to non-profit organizations so as not to erode municipal tax bases and impose undue hardship on local governments and taxpayers (*Matter of Association of Bar of City of N. Y. v Lewisohn,* 34 NY2d 143, 156-157, *supra; Matter of Genesee Hosp. v Wagner,* 47 AD2d 37, 45, affd on opn below 39 NY2d 863, *supra*). It is thus entirely proper that the university be required to furnish the financial records of activities at the dome so as to facilitate proper inquiry into the nature of its use.

As an alternative ground for exemption, the university urges us to read subdivision 9 of section 420 as providing an unqualified exemption for the dome. That subdivision, which was enacted specifically for facilities like the Carrier Dome (L 1980, ch 818, § 1, eff July 1, 1980), provides, by its own terms, that it should be read in conjunction with

the other provisions of the section ("in addition to the exemption provided in this section"). Further, the legislative history makes clear that it is to be read in conjunction with the other subdivisions of section 420 and that in order to obtain a full tax exemption the university must satisfy the exclusive use requirement of subdivision 1. Subdivision 9 was enacted in order to allow the State, a municipal corporation or another not-for-profit corporation to use the stadium without jeopardizing its exempt status as an educational corporation (NY Legis Ann, 1980, pp 341-342). To interpret subdivision 9 as exempting the Carrier Dome from the limitations contained in the other subdivisions of section 420 would allow the university to conduct profit-making activities without losing its tax exempt status in clear contravention of the legislative intent expressed in section 420 (subd 1, par [d]) which provides that property will not be exempt if its ostensible purposes are a guise or pretense for profit making.

Thus, before it can be determined to what extent the Carrier Dome is entitled to a tax exemption, there must be disclosure of its financial records so as to ascertain the nature of its primary activities.

Accordingly, the order of Special Term should be affirmed.

CALLAHAN, J. P., BOOMER and MOULE, JJ., concur.

Order unanimously affirmed, without costs.